IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAUL S. SIMONE | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| HARBORVIEW REHABILITION AND | : | |
| CARE CENTER AT DOYLESTOWN, LLC | : | |
| d/b/a Harborview, LLC d/b/a Harborview | : | NO. 20-3551 |

## MEMORANDUM OPINION

Savage, J.                                                                                                       June 3, 2021

      Plaintiff Paul Simone brought this action against his former employer, Harborview Rehabilitation Center, claiming that it discriminated against him and interfered with his rights in violation of the Families First Coronavirus Relief Act ("FFCRA") and the Americans with Disabilities Act ("ADA"). He asserts that he was terminated because he requested appropriate personal protective equipment ("PPE") and reported his COVID-19 symptoms. Simone also claims retaliation under the FFCRA and the ADA, and wrongful termination under Pennsylvania public policy.

      Moving for summary judgment, Harborview contends that Simone was not covered under the FFCRA because he was an exempt "health care provider" and that Simone resigned his position weeks before he reported COVID-19 symptoms. Simone claims he was terminated because he became infected with COVID-19 and complained of the lack of appropriate PPE.

      The central issue is whether Simone quit or was fired. If he was fired, he still cannot survive summary judgment on his ADA claims and his claim for wrongful termination under Pennsylvania law because Harborview had decided to replace him before he experienced COVID-19 symptoms, sought a medical diagnosis and reported

his symptoms. Whether he quit or was fired, he does, however, survive summary judgment on his FFCRA interference claim because was he still employed by Harborview and was a covered employee when he went out sick with COVID-19. Because the undisputed evidence shows that his termination preceded his COVID-19 symptoms, we shall grant summary judgment on his FFCRA retaliation, ADA, and wrongful termination claims.

**Background**

Simone worked as the Director of Maintenance at Harborview Rehabilitation Center, a nursing home facility in Doylestown, Pennsylvania, starting in September of 2019.[1] While he was at home quarantining after experiencing symptoms of COVID-19, his employment was terminated on April 28, 2020.[2]

Two weeks earlier, on April 14, Simone and Kyle Newfeld, his supervisor, had a conversation immediately after a department head meeting discussing the first positive COVID-19 resident of the facility.[3] The parties do not agree what was said and they interpret what part they agree was said differently. The dispute is whether Simone quit during this conversation.

Newfeld maintains that Simone resigned during that meeting. Simone counters he never told Newfeld he was quitting.[4] Although Newfeld concedes Simone did not explicitly

---

[1] See Def.'s Statement of Undisputed Material Facts at ¶ 1 (ECF No. 31-2) ("DSUF"); see also Def.'s Mot. for Summ. J. Ex. L at HRCD0106-08 (ECF No. 31-8).

[2] DSUF at ¶ 9.

[3] Def.'s Mot. for Summ. J. Ex. B at 45:5-18 (ECF No. 31-5) ("Newfeld Deposition Transcript").

[4] Def.'s Mot. for Summ. J. Ex. A at 105:14-20 ("… Mr. Newfeld has informed me definitively that it was in that conversation that he felt as if I resigned my position. I never quit my job, and I never resigned

2

state he was resigning, that is how he interpreted the conversation.[5] Newfeld asked Simone "if that meant he was leaving immediately or if he could at least give [him] time to find [ ] a replacement."[6] According to Newfeld, after Simone replied that he would "give [him] all the time in the world," he responded "give me at least two weeks to find someone."[7]

Simone claims he raised concerns about PPE with Newfeld during that meeting.[8] Because his job required him to be in residents' rooms, often while a resident was present and in close proximity,[9] he contends he "loudly" complained to Newfeld about the lack of adequate PPE for the maintenance staff.[10] Simone testified he was upset because "the maintenance team was not being given adequate and sufficient personal protective equipment, specifically masks."[11] He wore a bandana or other cloth face covering in lieu of formal medical protective equipment.[12]

---

my position, and I never indicated that I was leaving my position. I said it can't keep on like it is. It has to stop. You need to get us the appropriate PPE") ("Simone Deposition Transcript").

[5] Newfeld Dep. Tr. at 110: 18-21.

[6] *Id.* at 45:19-46:1.

[7] *Id.*

[8] *Id*. at 45:13-15 ("After that meeting I walked over into my office. He then came in and told me that he can't do this"); *see also* Simone Dep. Tr. at 104:6-10.

[9] Simone Dep. Tr. at 122:3-23.

[10] *Id.* at 104:6-10 ("I made that fact very clear to Kyle Newfeld, my immediate supervisor. That was the point and purpose that I need better PPE. We as a team need better PPE. The maintenance department needs it as much, if not more, than the nurses"), 108:13-20.

[11] *Id.* at 96:1-11.

[12] *Id.* at 96:13-97:23.

Newfeld denies that Simone complained about the lack of masks.[13] Instead, he contends that Simone was upset about COVID-19 in the facility. He claims that Simone said, "he can't do this. He can't be around this. That he wasn't worried for himself, that he was strong, but he was worried for his significant other."[14]

Immediately following the April 14 meeting, Newfeld took steps to replace Simone. That afternoon, he informed Tom Trauger, his supervisor, and Laura Erbs, the director of nursing, that Simone had resigned.[15] Later that day, Newfeld learned from Stephanie Dovidio, a nurse at Harborview, that a former co-worker of hers, Tom Bowie, might be available to replace Simone.[16] Bowie's contact information was provided to Newfeld via a text message from Dovidio at 4:01 pm that day.[17] Newfeld called Bowie to inquire if he was interested in the job.[18] He and Trauger later interviewed Bowie over Zoom "somewhere between [April] 14th and the 23rd."[19] Newfeld claims he orally offered Bowie the job on April 21 or 22,[20] before the official offer letter was created on April 22 by Josh Feinberg.[21]

---

[13] Newfeld Dep. Tr. at 47:20-22.

[14] *Id*. at 45:13-18.

[15] *Id.* at 117:10-18

[16] *Id.* at 118:6-10, 122:2-14., 123:25-124:6.

[17] Pl.'s Resp. Ex. A at HRCD0025 ("Text Messages") (ECF No. 33-2).

[18] Newfeld Dep. Tr. at 118:16-24.

[19] Def.'s Mot. for Summ. J. Ex. E at 21:12-15 (ECF No. 31-7) ("Bowie Deposition Transcript"); *see also* Newfeld Dep. Tr. at 118:19-24.

[20] *See* Newfeld Dep. Tr. at 120:17-25; Bowie Dep. Tr. at 21:7-22.

[21] Def.'s Mot. for Summ. J. Ex. H at HRCD0001.

4

On April 23, Simone began experiencing COVID-19 symptoms.[22] He told Newfeld and Trauger that he had a runny nose, a sore throat, a cough, and that his leg, which had been injured years earlier, was hurting.[23] In his words, he was "limping pretty bad."[24] Simone asked permission to leave work early. With Newfeld's approval, Simone clocked out at 12:58pm.[25]

A few minutes earlier, at 12:51pm, Newfeld had texted Bowie, saying "Hey Tom just checking in. I'm still waiting to have corporate get me an offer letter for you."[26] Bowie immediately responded, "that sounds great I have my PPD info and my physical," to which Newfeld replied "Great."[27] Newfeld testified that he hired Bowie before Simone told him he had COVID-19 symptoms.[28]

The next morning, April 24, Simone texted Newfeld that he was "sick" and was "pretty sure its what we don't want."[29] Newfeld inferred he meant COVID-19.[30] Newfeld replied to Simone, saying, "Stay home take care of yourself. If you need to do what is best

---

[22] DSUF at ¶ 9; Pl.'s Statement of Disputed Facts at ¶ 9 (ECF No. 33-1) ("PSDF").

[23] Simone Dep. Tr. at 75:6-16.

[24] *Id.* at 76:6-7; *see also* Def.'s Mot. for Summ. J. Ex. D at 61:10-17 (ECF No. 31-6) ("Trauger Deposition Transcript").

[25] Def.'s Mot. for Summ. J. Ex. M at HRCD0119-24.

[26] Text Messages at HRCD0018.

[27] *Id.*

[28] Newfeld Dep. Tr. at 120:17-25 ("Q: Okay. And do you remember if you hired Mr. Bowie before you were notified of Mr. Simone['s] [sic] symptoms related to COVID-19 or alleged symptoms? A: Yes. I had extended an offer to him probably I want to say Tuesday or Wednesday that week. And an offer letter was eventually drafted up and provided to him.").

[29] *Id.* at 81:20-82:4 (When asked if he believed this text from Simone was about COVID-19, he stated: "That's what I inferred by what he said, yes").

[30] *Id.*

5

for you and her, I understand. If this means you are not coming back as you told me I am willing to accept that."[31] Simone replied, "I will be back as soon as I'm done with this bug."[32]

The following Monday, April 27, at 9:05 am, Newfeld texted Simone inquiring about how he was feeling and if he would be "coming in today."[33] Simone replied that he was visiting the doctor that morning.[34] Simone did not return to work that day.

The next day, Newfeld called Simone to accept his resignation.[35] Simone claims he was surprised to receive the call.[36] Newfeld testified that this call was the first time Simone stated that he had not resigned during their April 14 conversation.[37] After the call, he texted Simone to ensure Harborview had "the correct address on file" to send him his bonus check and pay stub.[38] He also asked when he was returning to get his tools.[39] Simone gave Newfeld his address.[40]

---

[31] *See* Text Messages at HRCD0016, HRCD0013.

[32] Pl.'s Resp. Ex. B. at 11 (ECF No. 33-3) ("Simone Verizon Records").

[33] *Id.*

[34] *Id.*

[35] Newfeld Dep. Tr. at 77:12-78:3; Simone Dep. Tr. at 111:7-17.

[36] Simone Dep. Tr. at 111:7-17 ("He said to me we have decided we are going to accept your resignation. And I said -- and I quote -- what the hell are you talking about; I did not resign. He said we are not going to argue about that right now. We just don't want you back at the facility. I said, is there any way we can fix this? What are you talking about; why are you firing me? I am not firing you. Yes, you are. I don't know where to go with this. He fired me via telephone, waking me up from a sound sleep. The call ended").

[37] Newfeld Dep. Tr. at 46:20-47:5.

[38] Text Messages at HRCD0011.

[39] Simone Verizon Records at 11.

[40] *Id.*

6

The next day, Simone texted Newfeld that he was "covid positive and under Dr orders not to leave my house for any reason."[41] He also texted Trauger, Newfeld's supervisor, to explain that he never resigned.[42] Simone wrote: "I did not resign my position. When I spoke with Kyle three weeks ago I was telling him I can't keep working without proper PPE, not that I can't keep working. Additionally, I have informed him repeatedly since that conversation that I was not leaving my employee [sic] but he hired and already started my replacement."[43]

Simone's symptoms lasted three weeks.[44] His symptoms were a 102-degree fever, muscle pain and "pneumonia-like symptoms."[45] Simone was, at one point, hospitalized for his COVID-19 symptoms.[46] He claims that months later he had not completely recovered, claiming to have "decreased endurance" and a loss of strength.[47] Simone also claims he suffered significant psychological harm.[48]

## Standard of Review

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[41] *Id.*

[42] *See* Trauger Dep. Tr. at 54:1-55:12.

[43] *Id.* at 55:4-12.

[44] Simone Dep. Tr. at 126:3-6 ("[T]he active portion of my infection with COVID-19 lasted well over three weeks. It was a hard ride, real hard ride for three weeks. I was very, very sick for three weeks").

[45] *Id.* at 85:17-23; *see also* PSDF at ¶ 20.

[46] Simone Dep. Tr. at 150:5-12.

[47] *Id.* at 127:3-7.

[48] PSDF at ¶ 23 (citing Pl.'s Resp. Ex. I (ECF No. 33-10)).

FED. R. CIV. P. 56(a).  Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The initial burden of demonstrating that there are no genuine issues of material fact falls on the moving party.  FED. R. CIV. P. 56(a).  Once the moving party has met its burden, the nonmoving party must counter with "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted).  The nonmovant must show more than the "mere existence of a scintilla of evidence" for elements on which it bears the burden of production.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Bare assertions, conclusory allegations or suspicions are not sufficient to defeat summary judgment.  *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'"  *Matsushita*, 475 U.S. at 587 (citation omitted).

## Analysis

### FFCRA Claims

The Families First Coronavirus Response Act ("FFCRA") created "two new emergency paid leave requirements in response to the COVID-19 global pandemic,"[49]

---

[49] *See* Department of Labor Rules and Regulations, Paid Leave Under the Families First Coronavirus Response Act, 85 FR 19326-01, 29 C.F.R. Part 826 (April 6, 2020).

the Emergency Paid Sick Leave Act ("EPSLA") and the Emergency Family and Medical Leave Expansion Act ("EFMLEA").[50] Only the EPSLA is implicated here.[51]

The EPSLA provides eligible employees with 80 hours of paid sick leave "to the extent that the employee is unable to work (or telework) due to a need for leave" where:

> (1) The employee is subject to a Federal, State, or local quarantine or isolation order related to COVID-19.
>
> (2) The employee has been advised by a health care provider to self-quarantine due to concerns related to COVID-19.
>
> (3) The employee is experiencing symptoms of COVID-19 and seeking a medical diagnosis.

EPSLA § 5102(a)(1)-(3).

As a threshold matter, we must determine whether Simone was an eligible employer. The EPSLA permits employers to exclude "health care providers" from coverage. It provides that "an employer of an employee who is a health care provider or an emergency responder may elect to exclude such employee" from its benefits. EPSLA § 5102. Harborview elected to exclude "health care providers."

The question is whether Simone was a "health care provider" as defined in the FFCRA. If he was, he was not entitled to EPSLA leave.

The FFCRA adopted the definition of "health care provider" in the Family and Medical Leave Act of 1993, 29 U.S.C. § 2611. See FFCRA § 5110(4). The FMLA definition of "health care provider" includes "a doctor of medicine or osteopathy who is

---

[50] PL 116-127, March 18, 2020, 134 Stat 178, §§ 5101 et seq., and at §§ 3101 et seq, respectively. The EFMLEA expanded the FMLA and permitted employees to "take up to twelve weeks of expanded family and medical leave, ten of which are paid, for specified reasons related to COVID-19." See id.

[51] See Pl.'s Resp. at 1 n.1 (stating that "Plaintiff has not attempted to bring" claims under the Emergency Family and Medical Leave Expansion Act and that "[h]is claims fall under Sections 5102 and 5104 of the FFCRA, which are part of the Emergency Paid Sick Leave Act").

9

authorized to practice medicine or surgery (as appropriate)," or "any other person determined by the Secretary [of Labor] to be capable of providing health care services." 29 U.S.C. § 2611(6)(B).[52] On April 6, 2020, to implement the FFCRA, the Department of Labor ("DOL") published a temporary rule, effective on April 2. 85 Fed. Reg. 19,326 (Apr. 6, 2020). The rule expanded the definition of "health care provider" to include "*anyone* employed at *any … health care center*… or site where medical services are provided that are similar to such institutions…." *Id.* at 19,351 (§ 826.25) (amended Sept. 16, 2020) (emphasis added) ("Initial Rule").[53]

In *New York v. U.S. Department of Labor,* the district court held that the Initial Rule was invalid because the DOL had exceeded its authority when it expanded the definition of "health care provider" beyond the statutory definition. 477 F. Supp. 3d 1, 14 (S.D.N.Y. 2020). The court observed that the Initial Rule "hinge[d] entirely on the identity of the *employer*, in that it applies to *anyone* employed at or by certain classes of employers, rather than the skills, role, duties, or capabilities of a class of employees." *Id.* (emphasis in original). It concluded the Initial Rule was invalid because it "include[d] employees whose roles bear *no nexus whatsoever* to the provision of healthcare services, except the

---

[52] The FMLA's implementing regulation also lists others who provide "health care services," such as "podiatrists, dentists," and "nurse practitioners." 29 C.F.R. § 825.125.

[53] The DOL promulgated its rules implementing and interpreting the legislation without notice-and-comment procedures pursuant to a statutory designation of good cause under the Administrative Procedures Act. *See* Paid Leave Under the Families First Coronavirus Response Act, 85 FR 19326-01 (Apr. 6, 2020); *see also* FFCRA § 5111.

10

identity of their employers, and who are not even arguably necessary or relevant to the healthcare system's vitality," in violation of the clear language of the FFCRA. *Id.* [54]

In reaction to this decision, the DOL revised the rule on September 16, 2020.[55] The revision narrowed the definition of "health care provider" to conform to the statutory definition in the FMLA as adopted in the FFCRA. *See* 85 FR 57677-01, at 57683 (Sept. 16, 2020) ("Revised Rule"). The Revised Rule "identifies additional employees who are health care providers by focusing on the role and duties of those employees rather than their employers." *Id*. The new rule declared that "employees who do not provide health care services … are not health care providers even if their services could affect the provision of health care services, such as IT professionals, *building maintenance staff*, human resources personnel, cooks, food services workers, records managers, consultants, and billers." 29 C.F.R. § 826.30 (revised Sept. 16, 2020) (emphasis added). Under the Revised Rule, Simone, as a maintenance worker, was not an excluded "health care provider."

Because the Initial Rule was invalid and of no effect, the FMLA definition of "health care provider" applied.[56] Under that definition, Simone was not a "health care provider"

---

[54] The DOL admitted that under its Initial Rule, "an English professor, librarian, or cafeteria manager at a university with a medical school would all be 'health care providers.'" *New York*, 477 F. Supp. 3d at 14.

[55] The DOL noted that it "carefully examined the District Court's opinion and has reevaluated the portions of the temporary rule that the court held were invalid." *See* 85 FR 57677-01, at 57678 (Sept. 16, 2020).

[56] Two district courts have addressed the retroactive effect of the Revised Rule. *See Beltran v. 2 Deer Park Drive Operations LLC, et al*., No. 20-8454, 2021 WL 794745, at *7 (D.N.J., Feb. 28, 2021) (alleged termination April 13, 2020); *Payne v. Woods Servs., Inc*., No. 20-4651, 2021 WL 603725, at *5 (E.D. Pa. Feb. 16, 2021) (alleged termination April 14, 2020). In *Beltran*, Judge Schipp explained that "[u]nder the Administrative Procedure Act ('APA'), a federal court is authorized to 'set aside' unlawful agency action, such as the agency's promulgation of a rule that … exceeds the agency's authority or limitations under a statute, or that is otherwise not in accordance with the law." 2021 WL 794745 at *7 (quoting *Kinkead v. Humana, Inc*., 206 F. Supp. 3d 751, 753–54 (D. Conn. 2016)). He concluded that the

excluded from coverage. At the time he went out sick, he was a covered employee entitled to paid sick leave under EPSLA. If a jury finds he did not resign, Simone is entitled to paid sick leave from April 23 until he was able to return.[57] Therefore, because there is a question of material fact regarding whether Simone was fired or quit, we shall deny summary judgment on his FFCRA interference claim.

Simone also claims Harborview fired him in retaliation for taking EPSLA leave. Under the EPSLA, "it shall be unlawful for any employer to discharge, discipline, or in any other manner discriminate against any employee who … takes leave in accordance with this Act." EPSLA § 5104.

It is undisputed that Newfeld's decision to replace Simone was made prior to his getting sick and taking leave. After the discussion with Simone on April 14, Newfeld immediately informed Trauger and Laura Erbs, the director of nursing, that Simone had submitted his resignation.[58] Later that day, Newfeld was provided Tom Bowie's contact information.[59] After Newfeld reached out to Bowie,[60] he and Trauger interviewed him via

---

*New York* holding that the DOL exceeded its authority "had the effect of restoring the status quo before the vacated Temporary Rule provision took effect." *Id*. Both courts concluded that even though the Revised Rule is not retroactive, they were required to set the Initial Rule aside because it was "not lawfully promulgated." *See Beltran,* 2021 WL 794745 at *7 (citing *Payne*, 2021 WL 603725 at *5). They then applied the EPSLA's definition of "health care provider." *Id.*

[57] *See* Simone Dep. Tr. at 140:21-141:13.

[58] Newfeld Dep. Tr. at 117:10-18: ("I did two things, I can't recall which came first, I – one would be I informed my immediate supervisor Tom Trauger. And the other was go over and inform my director of nursing Laura Erbs").

[59] *Id.* at 118:11-15; *see also* Text Messages.

[60] Newfeld Dep. Tr. at 118:16-20; *see also* Bowie Dep. Tr. at 19:2-14.

Zoom.[61] By April 21 or 22, Newfeld had "extended an offer to [Bowie]."[62] Simone does not dispute that Harborview offered Bowie the maintenance director position on April 22.[63] Nor does he dispute that he did not exhibit COVID-19 symptoms until April 23.[64] Therefore, because the decision to replace Simone was made before he had COVID-19 symptoms and took leave, Harborview could not have retaliated against him for taking EPSLA leave.

*ADA Claims*

Simone claims that Harborview discriminated and retaliated against him because he was disabled or was perceived as disabled as a result of his COVID-19 symptoms. Whether he quit or was fired does not matter. Even if he was fired, the undisputed facts demonstrate that his termination was not based on a COVID-19 related disability or perceived disability.

As we have discussed, the undisputed facts show that Harborview decided to replace Simone before he complained of or had COVID-19 symptoms. After the April 14 conversation, Newfeld began the process to replace him. On April 22, Harborview offered Simone's position to Bowie.[65] Newfeld's decision to replace Simone was made before

---

[61] Newfeld Dep. Tr. at 118:19-24; *see also* Bowie Dep. Tr. at 19:15-23.

[62] *See* Newfeld Dep. Tr. at 120:17-25 ("Q: And do you remember if you hired Mr. Bowie before you were notified of Mr. Simone symptoms related to COVID-19 or alleged symptoms? A: Yes. I had extended an offer to him probably I want to say Tuesday or Wednesday that week. And an offer letter was eventually drafted up and provided to him.").

[63] DSUF at ¶ 7; PSDF at ¶ 7 ("Undisputed").

[64] DSUF at ¶ 9; PSDF at ¶ 9 ("Undisputed").

[65] DSUF at ¶ 7; PSDF at ¶ 7 ("Undisputed").

any perceived or actual COVID-related disability arose on April 23.[66] Therefore, because Harborview's employment decision could not have been based on a known or perceived COVID-19 related disability, we shall grant summary judgment on the ADA claims.

*Wrongful Discharge*

Simone also claims he was terminated in violation of Pennsylvania public policy because Harborview replaced him for reporting his COVID-19 workplace injury.[67] For the same reason Harborview is entitled to summary judgment on Simone's ADA claims, it is entitled to summary judgment on his wrongful discharge claim. The undisputed facts are that Harborview decided to replace Simone before he contracted and reported his work-related injury, COVID-19. Therefore, because Harborview's employment decision could not have been made based on Simone's reporting a workplace injury, we shall grant summary judgment on the public policy claim.

**Conclusion**

Disputed facts preclude summary judgment on Simone's FFCRA interference claim. However, because the undisputed facts establish that Harborview's decision to replace Simone was made prior to his COVID-19 symptoms, he cannot establish claims for FFCRA retaliation, violations of the ADA, or for wrongful termination for reporting a workplace injury. Thus, we shall grant Harborview's motion for summary judgment as to Counts II through V and deny it as to Count I.

---

[66] DSUF at ¶ 9; PSDF at ¶ 9 ("Undisputed").

[67] Pl.'s Compl. at ¶ 97 (ECF No. 1) ("Plaintiff engaged in protected activity related to his work injury or occupational injury, COVID-19, by reporting his symptoms of COVID-19 to his supervisor and then seeking medical treatment for his work-related condition and going off from work as the result of the work injury or occupational disease").